The case number 152220, John C. Buchanan, Jr. v. James W. Metz, II, is going to be 15 minutes per side. Mr. Stewart for the appellant. In January of 2011, my client, a businessman who had never even been charged with a crime, much less convicted of one, was charged in what seems to be an afterthought prosecution in a conspiracy case and a claim that he had attempted to defraud the Michigan government out of the better part of $10 million. This had many earmarks of a political prosecution from the beginning, because the Attorney General's office had looked at the same set of facts that ultimately led them to act previously, and partly at the urging of the director of the film office, who was the supposed victim, who said, this is nothing. This is political. This is nonsense. This is the Mackinac Center stirring everybody up. The AG at first had said, we're not going to do anything about this. But the political pressure got greater. The Mackinac Center beat the drum louder. The local newspapers got involved, and the Attorney General found himself in the middle of a primary race for the gubernatorial election that year. It seems like stunning coincidence that the day before that primary election, the day before, a charge was issued against the co-defendant without the Attorney General following their own procedures for writing up a request for warrant, which they call a request to initiate litigation. There was none on the co-defendant, Mr. Peters. It just popped out. Now they had time to issue a press release, beating the chest of the Attorney General and the governor for protecting the taxpayers from the savage action by these wrongful people. But they didn't have time to get a request for a warrant done according to their own procedures. Then they get around to my client, a couple of months later, they prepare one of these requests to initiate litigation, but they don't do anything with it. It kind of falls through the cracks. And later they say, well, it was out of deference to the fact we were going to have a change of administrations. Well, who cares unless it's a political issue? If it's, if it's a law enforcement issue, what difference does it make that you might, several months later, be having another Attorney General in there? But the real problem here isn't... I guess I don't follow. You say there's a political motivation, but it's, was the arrest warrant issued after Schutte became the Attorney General? It was, Your Honor. After Cox? I mean, the political things you're talking about is when Cox was the Attorney General, but nothing happened to your client. You're exactly right. And so how, I mean, I don't follow your argument, I guess. That was going to be my next sentence. What actually happened was that they got close to the preliminary examination for Mr. Peters, the co-defendant, and went, oops. Let's talk about your client, though. And we're, it's the very next thing. That's when they said, we're about to go to preliminary exam with Peters. We've got to do something about Buchanan, because if one did it, the other did it. That's when they resurrected the prosecution against Buchanan. But that's what started the ball rolling. And then they got caught up in their own momentum. What happened in... This is a lot of speculation, isn't it? Well, it would be were it not for the fact that the facts themselves, I mean, I was kind of taken by the fact that this press release came out the day before the election, and there's no request for a warrant, but... You're dealing with different Attorney Generals now. And I'm not going to, Terry... Administration there. I believe... As opposed to Cox, and you're trying to impute the motives from Cox to Schutte, I don't... What I'm saying is that once this whole set of prosecutions took on this momentum, it stayed that way. And here's how. We'll answer the question the court asked, what does this have to do with my client? My client was in a situation where, when Defendant Motley went in to get the warrant request, he represented basically four things. He said, Buchanan told the appraiser, you will come up with an appraisal in excess of $40 million. The only record evidence on that point was the appraiser, who had no criminal background, he was a businessman, specifically denying under oath that it had happened. However, Mr. Motley, later in his deposition in this case, said, well, the reason why I felt comfortable in going in and saying exactly the opposite as to what the record evidence was, was because he had told me in a private conversation the day before that that's what occurred. Okay? Wouldn't one have thought that if he was sitting, and he was, in that sworn deposition, and the appraiser says, I was not influenced and I would not have allowed myself to be influenced, that even then, at least at that point, Mr. Motley would have prepared a memorandum saying, this is not what he told me. He had a very complete file, loaded with his investigative notes, nothing on that. But even more telling is, we have the testimony from Mr. Motley as to what it was that he Adams had told him, was that Buchanan had said, I'm getting this appraisal to support a $40 million sale, and that the number that came out of the appraiser, and this is Mr. Motley's word, coincided with that number. From this, he extrapolates to tell the judge in the district court. You started out by talking about amazing coincidences. Yes. Sounds like they thought the same way. Well, but here's the thing. There were three other appraisals that had come in at even higher figures that Mr. Motley never even bothered to look at. So, yes, is it a coincidence? Do you think it was worth more than $40 million? I think as a film studio, using an income approach, yes. In fact, if what happened ultimately was, when the case was thrown out, Mr. One of the reasons that he gave for not appealing is that for every appraiser who'd say it was worth less, there was at least one who would say it was worth more, sometimes upwards of $55 or $60 million. And they dropped that theory for that reason. But this is one of the things that Mr. Motley is telling the issuing magistrate, is a reason why a fraud has been committed. The second thing that he tells him is that Mr. Peters and Mr. Buchanan, working together, because this was a conspiracy, had been repeatedly telling the film office, don't worry, this sale has taken place. This sale has taken place, don't worry, it's done. And the district court even found that the purchase agreement, which is loaded with contingencies, saying what it will take, including the issuance of the tax credits, in order to enable the sale. Everybody's saying that that meant that the sale had already been done. We have Peters, the co-defendant, Buchanan's being charged because of what Peters did. It's a conspiracy. We have Peters saying to the film office, would you hurry up and issue the credits because we can't close until you do. And they go, what? And he goes, yeah. And they go back and forth. We've got emails between... This is helpful, but maybe you could put this stuff in the context of, you know, so the inquiry is whether there was probable cause and it's qualified immunity. So you have to show it's clearly established that this kind of fact pattern did not create probable cause. So are there cases that you can point to where we look at them and we go, boy, the government lawyers should have known this because that's the basic inquiry. That's what we're supposed to be doing. I've not found a case on similar facts. I haven't. But that's usually a really significant question for us. It is the question. I don't lightly impose personal liability on government law enforcement when they violated something. In retrospect, they may have been wrong, but that's in retrospect. The question is, at the time they acted, was there something out there that should have pointed, should have seen that said, oh, we can't do that. Yes. And here's what it was. I started to go through the several things that Mr. Motley said, but I want to jump ahead to the most important thing. The statute upon which they were prosecuting both of these men requires that there be not just a false pretense given to the supposed victim, but an intent to defraud the person at the end. The best example I can give is the example in the People v. McCoy case, which is in the notes to the standard jury instruction on what it takes to prove false pretenses. In the McCoy case, the defendant was the president of a company that needed to buy certain equipment that he happened to own in his personal capacity. He knew, because of the apparent conflict of interest, that he wouldn't be able to get away with saying, how about if I sell it to you? So he turned the equipment over to a company that he created with a friend of his, funneled the equipment back through that company to the company of which he was the president, got caught at it, and got prosecuted and convicted. The Court of Appeals reversed the conviction by saying it may be unethical, and they were citing, by the way, Supreme Court authority, the People v. Jury case, this may be unethical, it may be sleazy, it may be a lot of things, but there was no intent to deprive the company of its just due. It paid for equipment, it got equipment, that is not a convictable offense. We cited other cases, I think on page 29 and 30 of our brief, that deal with exactly the same point of law. So you've got a standard jury instruction that says that, it cites to the cases that say that, and I've got Mr. Metz and Mr. Motley in their testimony both saying, we didn't care about that. Every witness that I deposed in this case. Let me ask you this question. So, you're saying, are you saying that there is no evidence at all that the prosecutor and the agent had that suggested that there possibly had been criminal law violations committed, that's what you're saying, that there's nothing there? No, I'm not saying that, Your Honor, because the false pretense statute has several elements, and one of them is the use of a false pretense. They had some reasonable suspicion that there were false pretenses. What are the things that pointed, in your view, to reasonable suspicion? I understand you're not talking probable cause right now, but just using your words, what do you know or what are you aware of that they knew or they had in their knowledge base before they went for that warrant, for the warrant? Simple. One of the things that they did relatively early on was to speak to my client's father. Father and son were at war by then, and father was being sued by contractors who had done work on this project to get it ready to be a film studio. So at that point, father is pushing all of the bad stuff downhill to the son and saying, he had no authority to act for me. I, I was the only person who had any authority to sell this property. You're saying that to Motley and Metz? That's right. So, at that point, I'm kind of with them, I'm kind of with Mr. Motley and Mr. Metz, that, okay, we've got something here. What else, don't tell me the things they didn't have, but right now, tell me what else did they have? That was the main thing. In fact, I can't think of anything else that they had then to go on. They claimed to have compu, com, representations to the film office that the sale had already taken place. I contend they did not. Well, you contend they did not, but they contend that they did. Yes, the trouble is, there's no evidence that they did. And in fact, the, the emails back and forth between the film office and the defendants shows conclusively that there was no argument that there had been any repeated representation of sale. In fact, Mr. Peters volunteered without being asked, we can't sell because you won't give us the credits. You would agree that the film office, or whatever the office is called, had some suspicions themselves, and that ultimately they didn't approve the, the, the application. Their suspicions ran to whether $40 million worth of improvements had been done on the building, because the film director came to the conclusion, contrary to the advice she'd gotten from Treasury at the beginning, that you couldn't use the acquisition cost of the building as part of the, of the base investment. They thought there was something fishy about it. They did, about the fact that the improvements hadn't been done. They did not doubt whether or not there had been a sale, because Mr. Peters told them, we can't sell. We can't complete the transactions in escrow. We can't get it out of escrow until the tax credits are approved. There was no misleading there. So the, the main thing that was missing in this case for the, the prosecution was any evidence of an intent to, to deprive the state of Michigan of anything. If you read McCoy, and read what happened here, and read every admission, every witness whom I deposed, every single one said, we never thought that they were going to take the money and go to Rio. That's the question I asked them. Did you think they were just going to take the money and go to Rio? Oh, no. You knew they were going to put it back into the studio and run it as a studio, didn't you? Oh, yeah. But if the, if the, there was enough evidence that they were trying to inflate values. Inflating values allows you to get a better tax credit than you're entitled to. It's those things for which I think there is some probable cause that allow the inference of intent to defraud. You don't have to jump to, we're taking money from the treasury and running the Caribbean. You're allowed to start with the more basic points, and it seems like there was some evidence on that. And I get your point about intent to defraud. I don't think, there isn't direct evidence of that. I think you're right about it. But that's not what you need here. It's inferences from other things, and it's just probable cause. Probable cause is not, it's below 50%. I understand. But on that point of inflating the value. Remember, we've got three different appraisers saying that if you use it as a film studio, you are into stratospheric dollars because of the cash flows that you can get on them. There was no appraisal that ever said otherwise. Ever. You've heard our questions. Let's hear from them. Thank you, Your Honor. I think you've got three minutes of rebuttal. We'll make sure you get a chance to answer. Thank you very much. Thank you. Thank you, Your Honors. Rock Wood from the Department of Michigan Attorney General. Mr. Joe Fralick is with me today, and I thank you for having me. This is not a case where there is wrongdoing, hiding of evidence, or some improper motive. This is a case where there's a complex and fluid scheme to defraud, where the defendant, well, it weren't the defendants in this case, but where the plaintiff, who was the underlying defendant, was constantly trying to mislead the film office. Why don't you talk, though, about what the defendants were aware of when they put in the affidavit about the warrant? I think that would be the relevant... All right. There's a wealth of it. So I'll answer your question, but it'll take me a moment. But that's what I want. I think that's most important than other information that doesn't... Fair question. Mr. Motley had, among other things, in his thousands of pages, the Bosser Day affidavit or... Go from best to worst. Just hit us with the really key stuff. Well, there's so much. There's the interviews of the witnesses who were involved, who said it was a fraud. There's the Michigan Film Office emails, of which there were many that said there was a fraud. There was this... Fraud is a really high level of general knowledge. Okay. I'm sorry. I shouldn't say that. People were involved. Just mention them as you go, quickly. Okay. People who were involved, who felt it was improper, would include Mr. Bosser Day, would even include the plaintiff's father, would include Ms. Lockwood from the film office, would include Ms. Launstein, who at her deposition, plaintiff scheduled her deposition, and we went through all the things that she was receiving or not receiving. And at the end of that, the plaintiff's counsel, maybe subconsciously or otherwise, said on the record, well, the way you're talking, Ms. Launstein, you make it sound like my client's so dishonest. And she said, yeah, I thought before the AG even got involved, there was fraud here. And she used the word fraud. So I used that word. But you have the purchase agreement that they did early on when the plaintiff admits he did not have authority to sell that was clearly intended to lead the film office to believe there was a sale. In fact, without that, they couldn't even do the application because the statute, the film tax credit statute, as it existed at that time, required that you be the owner of the property. You have Mr. Motley meeting with Mr. Adams several times. And during one of those conversations, Mr. Adams indicates that the plaintiff, and I use senior and junior here because they both have the same name, father and son, where junior told him as to what he wanted in the appraisal. The appraisal was inconsistent with public records. The appraisal was inconsistent with two recent appraisals that Mr. Adams had done just a couple of years earlier where he did the whole property for like $6 million. And now they're just doing two units and all of a sudden it's worth $40 million and it's never been transferred into a studio. And in those, it's interesting, because in those very recent appraisals that Mr. Adams did, he has, you know, footnotes that appraisers do and they have, you know, principles that they follow. And he says in those it would not be appropriate to use a replacement value for this property. Now all of a sudden, junior comes along and they whip up something in a week which uses exactly that value when just a couple of years earlier he said it wouldn't be appropriate. And property developers are sometimes known for puffery. Well, puffery is one thing. If I were to say this is a nice car I'm selling you, it's another thing if I take a property that's been listed for $8 million that I bought for $4 million that I've had appraised for $6 million and I represent to you, it's been transferred into a film studio and we've invested $40 million. And when they're talking to the film office, they're talking about capital outlays and what they've put into it. But at the same time, they say to the film office, well, you can't look at the invoices for what we've put into it. We're going to keep that information from you. And then they also reference in their brief, all along we wanted to do an appraisal. Well, yet if you look at the film office emails, and there are thousands of emails that Mr. Motley had, you see that the film office was constantly pushing and pushing to get its own appraisal. They said, we need this information from you so that we can get the appraiser informed. We want to do an appraisal. We want to see what you've put into this. We want to know that what you're saying is true. And they wouldn't give it to them. So I'm summarizing in fairly short order some of the key points, Your Honor, because as set forth in our brief, Mr. Motley probably had a hundred different pieces of evidence that illustrated this scheme. It was important for the record to just kind of know what they are. So I think it was important. And I hope I've hit enough of them. I hesitate to leave any out, but I also want to address some other points. Do you doubt he wanted to create a film studio? I think that the issue isn't whether he wanted to create a film studio. The issue is what did he do or represent and did he mislead in order to get it? And it's not unlike, for example, if we were to say to a bank robber on trial, and the bank robber gets up on the stand, he says, well, I was going to do good deeds with this money that I robbed. Well, it doesn't matter if you were going to do good deeds with the money that you robbed, you still robbed the money. And what the court, the district court pointed out in footnote 14, plaintiff, and this is page 34 of the court's opinion, plaintiff could have intended to defraud the Michigan film office in violation of the statute, even if he ultimately intended to deliver a film studio by securing the tax credit by unlawful means and derogation of the statute, by falsifying information, by inflating the tax credit. In fact, he shouldn't have even gotten a tax credit because unless he had a $40 million investment, you don't get a $10 million credit. The most you can get is 25%. And you have to actually put the money in. It's not like you can go to Walmart and say, give me the coupon for the rebate, but I'm never going to put the money in. So they never put the money in to even get the tax credit, let alone anything near $40 million. Now we go back to property developers. They try to do this all the time. They may try to do this sometimes, Your Honor, but I think what the real issue is, is did Mr. Motley and Mr. Metz, of course, Mr. Metz is the prime focus on him as the request to initiate, which is prosecutorial. But did Mr. Motley have probable cause? And there's such a wealth of opinion, or I mean, a wealth of information showing that he did have probable cause. It's interesting there's an admission that they had reasonable suspicion. In the Fourth Amendment context, the distinction is not all that great. And so I think there's no reasonable person requesting the arrest warrant would think that they have probable cause when it's already conceded that they have enough for reasonable suspicion. But a reasonable person would not think that this was enough for probable cause. I find that interesting. And another very interesting point that dovetails with that, Your Honor, is you look at the information that Mr. Motley had, and he didn't ignore anything, by the way. He went to the actual authors. He went to Senior, and Senior repeatedly said, and we quote this in our underlying brief, which is docket number 92. He was the one that drafted them. Mr. Buchanan Senior is a very experienced, well-known attorney. And he and his attorney drafted those, and he said repeatedly, and this is a transcript because Mr. Senior actually taped his conversation with Mr. Motley, and then it was transcribed. So he wasn't just going to meet with Mr. Motley. He was going to tape it. Very, very detailed person. And he said, Junior never had authority to sell. Even after my interest went into escrow, Junior never took a position in Alpinist. He never had the authority. He never reached the position. And he kept saying that. I'm the one that helped draft these. I'm the attorney. Look at these documents. He never had the authority. So what does Mr. Motley do? Does he ignore that? No, he then turns to the plaintiff and says, tell me your side of the story. And the plaintiff says, I'm not going to talk to you. And yet in this case now, the plaintiff comes in after the fact and said, I want to give my spin on the information. I want to characterize the testimony. I want to say what you should have thought. Well, none of that was available to Mr. Motley because of plaintiff's fault. So I think that's... What did you say? Because of plaintiff's fault? Well, because plaintiff refused to give that information to Mr. Motley. To come in after the fact and say... ...people's exercise of their Fifth Amendment rights against them. True. But if you're going to come in afterwards and say, you as the investigator should have known that my spin was this. You should have known my characterization was this. And you should have understood that I would have argued this. How would I know that if you won't tell me? I go to all the authors. I go to all the witnesses. And getting back to your point, Your Honor, you have Mr. Bossarday who was involved, who clearly in his interview with Mr. Motley called it deception. You have Ms. Lockwood who said it was deception. You have Ms. Launstein who said it was fraud. And you have Senior. And Senior goes on and on. And they say, well, you shouldn't believe Senior. Well, Senior was credible for all purposes that we knew. There was nothing to show that he deceived anybody. And in fact, there's never been any finding that he had any role in any deception. And what Senior said that was interesting on the value, and this is in the transcript of Senior's interview, he said, nobody was going to sell that shell building for $40 million. You're not fooling anybody with that. This is what he tells Mr. Motley. As to the alleged- He told him that before. Yeah. Before he went for the warrant. He told him that in July before even Mr. Peters had a warrant. And he told him, and this is July 24, 2010 for the record, and it's at underlying page 4431 of the record, on the underlying record. And he says, as to that $40 million value, quote, no one is that dumb, end quote. And then he says, the state did what they should have done. And then quote, the state isn't stupid to believe the $40 million value. So here you have a sophisticated attorney who owns the property, who's drafted the documents, who has all the financials, who is involved with this purchase of this. And he says, there's nowhere near $40 million for value. All of this wealth of information that Mr. Motley has, this isn't a case where we're going in, to use the word skinny, on one or two pieces of evidence. This is where Mr. Motley has so much evidence, literally, I'd need a wheelbarrow to bring it in. So you're saying you don't look to the point of the preliminary hearing, which the judge held, where ultimately charges were dismissed or not pursued. But you look back to the time before they sought the warrant to see what they had. And so was there probable cause at the time, which would support the issues of the warrant, as opposed to this later point in time, where the record was developed through testimony and other means? Yes, you have to look at what the officer had available to him or her, and what they could have reasonably believed, and was there any prima facie evidence. And here I would submit there was more than prima facie evidence. And to say, well, later, some court said there wasn't probable cause, or if the defendant were on trial later, the defendant was found innocent. If that were the standard under Section 1983, we would just say, well, everybody who's found innocent automatically gets a judgment against the government. That's not what it says. So you have to have some wrongdoing here and some impropriety, and it just doesn't exist. Mr. Motley diligently, repeatedly, and if you look at the affidavit that we attached to our underlying brief, which lists all the different things he did, there's that much evidence. And that doesn't include going out, talking to people, interviewing people, repeatedly calling people. This is not a situation where somebody was fooling around with evidence, where there was some kind of animus of some sort. It's just not there, Your Honors. Okay, I think I understand your argument. Thank you. You haven't said anything about Metz, have you? The only thing I said about Metz... Metz has got absolute immunity. He does have. That's all I can say, right? Yes, he has absolute immunity, and what the plaintiff really focused on with him is they don't like the fact that he looked at the evidence and decided to initiate charges, and that falls under the prosecutorial discretion there. All right, thank you. Appreciate your time very much. Thank you. Mr. Wood. Mr. Stewart. If I may, I'd like to pick up where Judge Griffin left off on both points that Judge Griffin has made today. Did you argue Metz in your initial argument here? I didn't. You're in rebuttal now. Well, I guess they did because I asked the question, so you are in rebuttal as to Metz. So go ahead. Thank you, Your Honor. Mr. Metz stated in defending why he wasn't looking at the elements of the charge, why he didn't feel constrained to figure out whether there was an intent to defraud, he said, I was just the investigator. That's in his testimony where he said, I was just the investigator. An intent to defraud is usually circumstantial, and you look at the evidence, I mean, you very rarely have direct evidence where somebody will admit the guilty intent. So you look at all the evidence, and can you infer, reasonably infer, intent based upon the circumstantial evidence? And they say, yes, they could. And obviously, the magistrate, when he found no probable cause, went the other way. But I'm speaking to a different point, Your Honor. I didn't make that clear. Your Honor said he had absolute prosecutorial immunity. That's all that needs to be said on this point. That is true when he's acting in a prosecutorial role, not when he's acting in an investigative role. So the point that I... What was the investigation? I thought he reviewed the evidence and determined or gave his approval to seek the arrest warrant. I didn't realize that Metz, as the assistant attorney general, actually went out and investigated this. He did. He was taking depositions. He sat in on the Doug Adams deposition. He did the accountant deposition, Mr. Weiss, all by himself. He did the Kingman deposition, who was the real estate broker, all by himself. And every subpoena that he issued was entitled investigative subpoena. And then, as I indicated a moment ago, when I was pressing him, why weren't you looking to see if you had probable cause on the intent element? He said, that wasn't my job. My job was to investigate the facts and report them to my superior. And when he did report them to his superior, he did so in his request to initiate litigation. And he has two sections in it. One, I'm asking for a warrant. Two, facts. And every other word that's in his document is under the heading facts. He makes no analysis. He doesn't say why he's saying what he's saying. He just says, here are the facts. Boom, boom, boom. He had no role in the decision to initiate the prosecution? None. He was told on day one, here's the charge you're going to investigate. His superiors told him in an email, you're investigating... Why didn't you erase this at the beginning so the other side could have a chance to respond to this? I ran out of time. I'm sorry, Your Honor. I mean, you did know ahead of time how much time we allocated. I did. But the questions threw me off and all I can tell you is it's in the briefs. I mean, you're right. I didn't raise it in argument. It is all over the briefs on this issue. No, I think we got to move on. Okay. All right. Well, your time's... Go ahead. Use your time how you want to use it. The other point that I would make is that if somebody feels they have plenty of good evidence, why would they give bad evidence? The record shows that Mr. Motley misrepresented what the appraiser had told him, had no good explanation for why he hadn't written a memorandum if he was going to be impeaching the appraiser, and misrepresented the other facts concerning these repeated sales. If you have good stuff, you don't use bad stuff. We're claiming that he misrepresented intentionally and the brief covers that as well as we think we can, Your Honor. Okay. Thank you, Mr. Stewart. Thank you, Mr. Wood. We appreciate your briefs, your written submissions, your arguments, and thanks for helping resolving the case and answering our questions. The case will be submitted.